# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **TEJAS INCORPORATED** | § | |
| | § | A-09-CV-0281 LY |
| **V.** | § | |
| | § | |
| **SCOTT SIEMERS, KENNETH CASEY,** | § | |
| **AND ANDREW ADDERLY** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO:   THE HONORABLE LEE YEAKEL**
      **UNITED STATES DISTRICT JUDGE**

Before the Court are: Defendants' Motion to Compel Arbitration filed on May 22, 2009 (Clerk's Doc. No. 7); Defendants' Motion to Dismiss Pursuant to Rule 12(B)(6) filed on June 23, 2009 (Clerk's Docket No. 21); and the Parties' various response and reply briefs.[1]

On June 17, 2009, the District Court referred the motion to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges. The Court held a hearing on the above-motions on July 17, 2009, and now submits this Report and Recommendation to the United States District Judge.

## I. GENERAL BACKGROUND

Plaintiff Tejas Incorporated ("TINC" or "Plaintiff") is a holding company which owns, in whole or in part, several subsidiary companies, including Tejas Securities Group, Inc. ("TSG"), a full

---

[1] The Parties have also filed cross Objections and Motions to Strike Evidence in support of their respective Motions and Responses. The Court HEREBY DENIES the Motions to Strike (Clerk Docket Nos. 29 & 31) and notes that it has not relied on any improper evidence in ruling on the above-motions.

service securities brokerage and investment banking firm. Defendants Scott Siemers, Kenneth Casey and Andrew Adderly ("the Siemers Group or "Defendants") are licensed securities brokers residing in the State of New York. In October of 2008, Defendants attempted to purchase a 51% interest in TINC and its subsidiary, TSG. While TINC and the Defendants were engaged in negotiations regarding the acquisition, they entered into a written letter agreement ("the Side Letter Agreement") regarding Defendants' responsibility to reimburse TINC for business expenses paid or advanced by TINC on Defendants' behalf during the negotiations. *See* Side Letter Agreement, Exh. A to Plaintiff's Complaint. Specifically, the Side Letter Agreement provided that in the event that the stock purchase deal "fails to close," Defendants agreed to reimburse TINC for certain business expenses incurred by TINC. *Id.*

On February 17, 2009, TINC terminated all negotiations with Defendants regarding the stock purchase agreement. TINC avers that the deal failed to close because the Defendants were unable to raise the necessary capital. In contrast, Defendants contend that John Gorman, Chairman of the Board of Directors of TINC, sabotaged the acquisition in order to keep Defendants from acquiring a majority interest in TINC. Regardless, TINC alleges that after the stock purchase failed to close, Defendants refused to reimburse TINC for its business expenses, as provided in the Side Letter Agreement. Accordingly, on March 12, 2009, TINC filed the instant breach of contract lawsuit in state court against the Defendants, alleging that Defendants violated the Side Letter Agreement by failing to reimburse TINC for its business expenses.

On April 15, 2009, Defendants removed the case to federal court on the basis of diversity jurisdiction. On May 7, 2009, Defendants filed an arbitration proceeding before the Financial Industry Regulatory Authority ("FINRA") against TINC, TSG, John Gorman, Chairman of the Board

of Directors of TINC, Kurt Rechner, former President and Chief Operating Officer of TSG, Kurt Morales, TSG's Chief Financial Officer, Michael Cuckler, TSG's Chief Compliance Officer, and Barry Williamson, a director of TINC. *See* FINRA Dispute Resolution Arbitration No. 09-02599, Exhibit 8 to Defendants Motion. In their arbitration proceeding, Defendants seek a declaratory judgment that they do not owe TINC or TSG any money under the Side Letter Agreement, and allege that TINC, TSG and the above-individuals breached the Joint Venture Agreement, breached their fiduciary duties, committed fraud and negligent misrepresentation, violated New York labor laws, breached the covenant of good faith and fair dealing under the Side Letter Agreement, tortiously interfered with business relationships and were guilty of unjust enrichment. Defendants contend that they were required to arbitrate their claims against TINC, TSG and the above-individuals because Defendants—along with TSG—had signed a Uniform Application for Securities Industry Registration or Transfer ("U-4 Registration") containing an arbitration provision requiring them to arbitrate any dispute with TSG before the FINRA. Defendants have now filed the instant Motion to Compel Arbitration arguing that TINC's claims in this lawsuit are subject to the jurisdiction of FINRA and must therefore be arbitrated before FINRA.

## II. ANALYSIS

Defendants contend that TINC's claims in the instant lawsuit are subject to the jurisdiction of FINRA and thus must be arbitrated before that body. While Defendants acknowledge that TINC is not a member of FINRA and did not sign the U-4 Agreement or any other agreement containing an arbitration provision, Defendants nevertheless argue that TINC should be compelled to arbitrate this case under the doctrines of equitable estoppel and the alter ego theory.

Generally, in order to be subject to arbitral jurisdiction, a party must be a signatory to a contract containing an arbitration clause. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 353 (5th Cir. 2003) ("*Bridas I*"). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). However, federal courts have compelled nonsignatories to arbitration agreements to arbitration under various theories of contract and agency law including: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego or veil piercing; (5) equitable estoppel; and (6) third-party beneficiary. *Graves v. BP America, Inc.*, 568 F.3d 221, 223 (5th Cir. 2009) (citing *Bridas I*). In the instant case, Defendants are only pursuing the theories of alter ego and the "intertwined claims" theory of equitable estoppel. Accordingly, the Court will now determine whether these doctrines apply in this case.[2]

### A. Equitable Estoppel

Relying on *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524 (5th Cir.), *cert. denied*, 531 U.S. 1013 (2000), Defendants argue that the Court should apply the "intertwined claims" theory of equitable estoppel to compel TINC, a nonsignatory to the arbitration clause, to arbitrate this case. Under the intertwined claims theory of estoppel, a *signatory* may be estopped from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. *Bridas I*, 345 F.3d at 361.

---

[2]Defendants have clarified in their reply brief that they are not pursuing the direct-benefits estoppel theory in this case. *See* Defendants' Reply at note 1. Accordingly, the Court need not address TINC's arguments with regard to this theory.

A signatory, however, "may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group*, LLC, 268 F.3d 58, 61 (2nd Cir. 2001).

In *Grigson*, a group of movie producers sought to recover damages for breach of the distribution agreement for the film "Return of the Texas Chainsaw Massacre." *Grigson*, 210 F.3d at 525-26. The producers first sued the studio, but dismissed the lawsuit when the studio sought to compel arbitration under a clause in the distribution agreement. The producers then sued one of the actors in the movie and the actor's agent, alleging that they influenced the studio to breach the distribution agreement. The Fifth Circuit held, first, that because the claims were based on a breach of the distribution agreement containing the arbitration clause, the producers were estopped from denying the applicability of the clause. *Id.* at 527-28. In addition, the Court stated that "it would be especially inequitable where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant. In such instances, that signatory, in essence, becomes a party, with resulting loss, inter alia, of time and money because of its required participation in the proceeding." *Id.* at 528. The Court justified applying equitable estoppel in *Grigson*, in part, because to do otherwise would permit the signatory plaintiff "to have it both ways." *Id.* at 528. "[The plaintiff] cannot, on the one hand, seek to hold the nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a nonsignatory." *Id.*

TINC, unlike the estopped party in *Grigson*, did not sign a contract containing an arbitration provision and has not sued Defendants on the U-4 Agreement containing the arbitration provision. As the Fifth Circuit has explained, [t]he distinction is *not* one without a difference." *Bridas I*, 345

5

F.3d at 361. "[T]he Grigson version of estoppel applies only to prevent 'a *signatory* from avoiding arbitration with a nonsignatory when the issues the *nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.*'" *Id.* (quoting *Thomson-C.S.F., S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995) (emphasis in original). "[B]ecause arbitration is guided by contract principles, the reverse is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." *Bridas I*, 345 F.3d at 361 (quoting *MAG Portfolio Consultant,*, 268 F.3d at 62). See also, *EI Dupont De Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates,* 269 F.3d 187, 201-202 (3rd Cir. 2001) (holding that non-signatory corporation could not be compelled to arbitrate claim on the basis of equitable estoppel since doctrine only applies to signatories); *Ericsson, Inc. v. Comscape Holding, Inc.,* 2000 WL 708917 at * 4 (N.D. Tex. May 31, 2000) (holding that because non-signatory was not a party to the arbitration agreement, "no amount of equity can be invoked to circumvent its right to trial before a judge or jury"). As the Fifth Circuit has explained, the result in *Grigson* and similar cases makes sense because the parties resisting arbitration have expressly agreed to arbitrate claims of the very type that they asserted against the nonsignatory. *See Bridas I*, 345 F.3d at 61. In the instant case, however, TINC was not a signatory to the arbitration agreement and thus cannot be coerced into arbitration on the theory that TINC's claims in this suit are intertwined and inherently inseparable from the claims asserted in the arbitration proceeding. "[T]his expanded version of equitable estoppel would threaten to overwhelm the fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement." *Id*. Accordingly, the *Grigson* theory of equitable estoppel does not apply to the facts of this case.

**B.     The Alter Ego Theory**

Defendants next contend that TINC should be compelled to arbitrate this case under the alter ego doctrine. Specifically, Defendants argue that TINC is the alter ego of TSG and because TSG signed the U-4 Agreement containing the arbitration provision, TINC should be compelled to arbitrate the case. The Court disagrees.

A bedrock principle of corporate law is that "a parent corporation is not liable" for actions taken by its subsidiaries. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). However, under the alter ego doctrine, "a corporation may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, 'when their conduct demonstrates a virtual abandonment of separateness.'" *Bridas I*, 345 F.3d at 358-59. "The alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir.), *cert. denied*, 549 U.S. 1051 (2006) ("*Bridas II*"). The alter ego doctrine is "reserved for those cases where the officers, directors or stockholders utilized the corporate entity as a sham to perpetuate a fraud, to shun personal liability, or to encompass other truly unique situations." *Matter of Multiponics, Inc.*, 622 F.2d 709, 724-25 (5th Cir. 1980). See also, *Bridas I*, 345 F.3d at 359 (quoting *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1461 (10th Cir. 1995) (noting that "[c]ourts do not lightly pierce the corporate veil even in deference to the strong policy favoring arbitration"). The corporate veil may be pierced to hold an alter ego liable for the commitments of its instrumentality *only* if: (1) the owner exercised complete control over the corporation with respect to the transaction

at issue,[3] and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil. *Bridas I,* 345 F.3d at 359. Alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions. *Id.*

### 1. Fraud or Injustice

Because it is dispositive of the arbitration issue before the Court, the Court will first address the "fraud or injustice" prong of the alter ego test. *See Bridas II*, 447 F.3d at 416 (opting to address the fraud prong first "given the difficulty of analyzing the control factors"). In order to meet this factor of the alter ego test, Defendants must demonstrate that TINC used its control of TSG to commit a "fraud or injustice" against the Defendants. *Bridas II*, 447 F.3d at 416. Importantly, the fraud or injustice in question must be "based on misuse of the corporate organizational form." *Id.* at 417.

---

[3]To determine whether a party has demonstrated the first factor of the alter ego test—whether the parent company exercised complete control over the subsidiary—courts look at whether:

(1) the parent and subsidiary have common stock ownership;
(2) the parent and subsidiary have common directors or officers;
(3) the parent and subsidiary have common business departments;
(4) the parent and subsidiary file consolidated financial statements;
(5) the parent finances the subsidiary;
(6) the parent caused the incorporation of the subsidiary;
(7) the subsidiary operated with grossly inadequate capital;
(8) the parent pays salaries and other expenses of subsidiary;
(9) the subsidiary receives no business except that given by the parent;
(10) the parent uses the subsidiary's property as its own;
(11) the daily operations of the two corporations are not kept separate;
(12) the subsidiary does not observe corporate formalities.

*Bridas I,* 345 F.3d. at 360, n.11. Additional factors courts may look to include factors such as whether: (1) the directors of the "subsidiary" act in the primary and independent interest of the "parent,"; (2) others pay or guarantee debts of the dominated corporation; and (3) the alleged dominator deals with the dominated corporation at arms length. *Id.*

Defendants contend that they "suffered harm as a direct result of the lack of separateness between TINC and TSG and, ultimately, the ability of one man, John Gorman, to completely control both entities." Motion to Compel, at p. 12. Specifically, Defendants claim that they lost their intended acquisition of TINC because of Gorman's efforts to sabotage the acquisition. In addition, Defendants claim that they lost a significant amount of money in salary and commissions because TINC failed to pay them for their efforts in operating the New York office of TSG. Defendants also claim that they lost hundreds of thousands of dollars relating to the acquisition of TINC and contend that their business reputations have been damaged by their failure to acquire TINC.

These allegations are far from the "fraud or injustice" required to show that one entity is the alter ego of another. Defendants have merely alleged "a generic allegation of wrongdoing," which is insufficient to show fraud or injustice under the alter ego theory. *Mills v. City of Port Arthur, Texas*, 2006 WL 3531460 at *10 (E.D. Tex. Dec. 4, 2006). More to the point, Defendants' allegations regarding Mr. Gorman's conduct completely fail to demonstrate that the fraud or harm occurred as a result of " misuse of the corporate organizational form." *Bridas II*, 447 F.3d at 417. When the Court raised this question at the hearing on the motion, Defendants' counsel was unable to articulate how the alleged misuse of the corporate form was the cause of Mr. Gorman's alleged efforts to sabotage the deal. Indeed, Mr. Gorman could have committed all of the wrongs he is accused of while the corporate formalities were meticulously followed. Thus, Mr. Gorman's alleged wrongdoing is independent of the corporate organizational issues Defendants raise, and cannot form the basis of an alter ego claim. Defendants have failed to demonstrate that TSG was established for a fraudulent purpose or that the "corporate form was used as a 'sham to perpetuate a fraud.'" *Id.* at

9

416. Accordingly, piercing the corporate veil under the alter ego theory is not appropriate in this case.

**C.      Other Policy Concerns**

Lastly, Defendants argue that because the instant lawsuit involves the same operative facts and witnesses as the FINRA arbitration, the Court should compel arbitration in this case "in the interest of judicial economy" and to be consistent with the strong public policy in favor of arbitration. Defendants' Motion to Compel, at 2 & 14. This is a fundamentally flawed argument. "Although there is a strong federal policy favoring arbitration, this federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Will-Drill Res., Inc. v. Samson Res. Co.,* 352 F.3d 211, 214 (5th Cir. 2003) (quoting *Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)). See also, *Volt Information Sciences, Inc. v. Board of Trustees of Leland*, 489 U.S. 468, 478 (1989) ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so."); *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (noting that "the public policy favoring arbitration does not apply to disputes the parties have not agreed to arbitrate") (internal citations and quotations omitted). Because TINC did not sign an arbitration provision, there is no public policy favoring arbitration in this case.

In addition, Defendants' concerns with judicial economy are not relevant to the issue of whether the Court should send this case to arbitration. In *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985), the Supreme Court held that the Federal Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one party files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.

10

The Court reasoned that "[t]he preeminent concern of Congress in passing the [Arbitration] Act was to *enforce private agreements into which parties had entered*, and that concern requires that [courts] rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute." *Id.* at 217 (emphasis added). Thus, when considering whether to send a case to arbitration, any concern for judicial economy is not relevant. *See also, Seguros Banvanez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 862 (2d Cir. 1985) (holding that the district court may not, on considerations of judicial economy, refuse to stay the proceedings before it in favor of arbitration). More importantly, however, TINC did not agree to arbitrate this case and thus cannot be compelled to arbitrate even if it would promote judicial economy to do so. See *AT & T Techs.*, 475 U.S. at 648 (noting that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"). Accordingly, the Court finds that Plaintiff should not be compelled to arbitrate this case before FINRA.

## III. RECOMMENDATION

Based on the above, the undersigned RECOMMENDS that the District Court DENY Defendants' Motion to Compel Arbitration (Clerk's Docket No. 7) and DENY Defendants' Motion to Dismiss (Clerk's Docket No. 21).

## IV. WARNING

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-153 (1985); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-30 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 26th day of August, 2009.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE